## McDevitt v. Satterfield, et al.

(Decided June 22, 1917.)

## Appeal from Caldwell Circuit Court

· **Principal and Surety—Co-signers—Nature of Relation—Evidence.** —In an action by certain co-signers of a note to recover of another co-signer as principal, evidence examined, and held to show that defendant was a principal so far as plaintiffs were concerned.

BERRY & GRASSHAM and BENJAMIN S. WASHER for appellant.·

JOHN C. GATES and J. FLEM GORDON for appellees.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Affirming.

On January 10, 1913, the Preston Hotel Company, James R. White, B. M. McDevitt, R. R. Satterfield, Mary Bird Satterfield, Hugh Satterfield and C. N. Satterfield, executed and delivered to the First National Bank of Princeton their promissory note, by which they jointly and severally promised and agreed to pay said bank, or order, six months after date, the sum of $10,000.00, with interest from maturity at the rate of 8 per cent per annum until paid. The note was secured by fifty shares of the capital stock of the American Ice & Storage Company, and fifty-eight shares of the capital stock of the Oakland Amusement Company. On July 10, 1913, this note was renewed by the same parties, with the exception of the Preston Hotel Company, and by F. P. Satterfield and H. K. Satterfield, who had not signed the original note. On January 10, 1914, the note was again renewed for a period of one year by the same parties and by the Preston Hotel Company. Upon the maturity of the last renewal the bank insisted on payment or more satisfactory security. The Satterfields insisted that McDevitt should pay the note or furnish the required security, but he declined to do either. Thereupon the Satterfields mortgaged their home farm to the bank to secure the amount of their indebtedness, and also the sum of $6,000.00, which R. R. Satterfield owed to the bank. The bank then assigned the renewal note of January 10, 1914, to F. P. Satterfield, together with the collateral pledged by McDevitt. The Preston Hotel Co., went into bankruptcy.

McDevitt having declined to pay the note, F. P. Satterfield brought suit against him and the other signers to recover the amount of the note. McDevitt answered, and pleaded in substance that he, together with James R. White, R. R. Satterfield and the other Satterfields who had signed the original note, were all accommodation sureties for the Preston Hotel Company, and that he was liable to plaintiff for only one-eighth of the amount of the note. H. K. Satterfield, Hugh Satterfield, Mary Bird Satterfield and C. N. Satterfield, filed an answer and cross-petition, pleading in substance that McDevitt, White and R. R. Satterfield were principals in the note, and that the answering defendants signed the note as mere sureties for them. On final hearing, plaintiff, F. P. Satterfield, was given judgment against McDevitt and the other Satterfields for the note and interest, and awarded a lien on the collateral security, which was directed to be sold and the proceeds applied to the payment of the debt. The defendants and cross-petitioners, H. K. Satterfield, Hugh Satterfield, Mary Bird Satterfield and C. N. Satterfield, were also given judgment against McDevitt for the sum of $10,000.00 and interest, unless the judgment in favor of F. P. Satterfield should be satisfied by McDevitt. McDevitt appeals.

The propriety of the chancellor's judgment depends on whether McDevitt was the principal in the note sued on so far as the Satterfields are concerned, or he and they were mere joint sureties for the Preston Hotel Company. To determine this question a somewhat extended statement of the evidence will be necessary.

The Preston Hotel Company, a corporation, was organized several years ago with a capital stock of $8,000.00, which was owned in equal amounts by James R. White, R. R. Satterfield and T. A. Green. The corporation was engaged in the operation of a hotel at Third and Main Streets in Louisville, and its business had prospered. In 1911, T. A. Green retired from the corporation. In 1912, extensive improvements were planned, to meet what apeared to be the growing demands of the business. McDevitt had been a boarder at the hotel and had frequently accommodated the company with small loans, which had been repaid. As the contemplated improvements called for a large sum of money, White and R. R. Satterfield solicited the assist-

ance of McDevitt. R. R. Satterfield says that the negotiations between White and him, on the one side, and McDevitt, on the other, resulted in an agreement by which the capital stock of the corporation was to be increased to $50,000.00, and one hundred and twenty shares issued to McDevitt in consideration of a loan by McDevitt to the hotel company of $10,000.00, which the company was to repay. At the same time, R. R. Satterfield proposed to furnish $6,000.00. Thereupon McDevitt endeavored to borrow the $10,000.00 in Louisville, but failing to do so, requested Satterfield to secure it from the First National Bank at Princeton. On November 5, 1912, McDevitt wrote to Satterfield as follows:

"If you are successful in arranging the loan, I can pledge for security 50 shares (par value $100) of American Ice & Cold Storage Co. stock, never failed to pay 6%; 50 shares of Oakland Amusement Co. stock (same value), a moving picture theatre doing big business and own its building."

Upon receipt of this letter, Satterfield applied to the First National Bank at Princeton for the loan. At first the bank agreed to furnish the money on the faith of the collateral. When the money was needed the bank demanded additional security. When this fact was reported to McDevitt, it was proposed that White and R. R. Satterfield should sign the note and pledge their stock in the hotel company as additional security. This proposition was rejected by the bank, which demanded that R. R. Satterfield procure the signatures of his brothers and sister. Satterfield then reported to McDevitt and White, who then agreed that, in order to save his brothers and sister from loss, to put up their stock in the hotel in addition to the stock which McDevitt had previously authorized him to hypothecate. R. R. Satterfield then secured the consent of his brothers and sister to sign the note, upon assuring them that he, McDevitt and White would save them from loss, and that they would be fully protected by the collateral attached to the note. His brothers and sister also say that they signed the note as sureties on the faith of the assurance thus given.

McDevitt testified that, prior to 1912, he had been engaged in buying and selling real estate and managing two picture shows. Prior to that time he knew James R. White very well and had a casual acquaintance with

R. R. Satterfield. Up to that time he had made three or four loans to the Preston Hotel Company on the credit of James R. White, and these loans were repaid by him. During that year the hotel company contemplated certain improvements and extensions, which it was believed would cost $15,000.00 or $16,000.00. At that time it was agreed to increase the capital stock to $50,000.00, and White proposed that McDevitt lend the company $10,-000.00, for which he was to receive $12,500.00 worth of the stock. This proposition McDevitt declined. He and White first attempted to borrow the $10,000 for the hotel company in Louisville, but were unable to do so. Thereupon R. R. Satterfield and White arranged to make the loan at Princeton. This loan was to be made solely to the Preston Hotel Company and was to be secured by the endorsements of R. R. Satterfield, White and McDevitt. The bank declined to make the loan upon these conditions. Not knowing McDevitt, the bank required collateral to make his signature good. It further required the entire capital stock of the hotel company to be deposited as collateral security. In obtaining the loan, McDevitt did not authorize anyone to state to the bank, or anyone else, that the loan was for him. On the contrary, the note was executed in the belief that it was a joint and several note, upon which each of the endorsers would be equally liable. $12,500.00 worth of stock was issued to him, and he was subsequently required to pay for it. However, in discussing the proposition made to him by White, McDevitt testified as follows:

"A. I told Jim—I said I did not care to be interested in the hotel business, that I did not feel like that I knew anything about it, or wanted to give it any of my time. I told Jim then—I said, 'Now, Jim, I will help you in any way that I can. I will go as far with you as I can, but I don't care about becoming interested in the hotel,' and Mr. White then said, 'Unless I would agree to have the stock, that he did not want to borrow the money from me.' I said, 'All right, Jim, go ahead your way.' I said, 'I have absolute confidence in your ability to pull this thing through, and I will help you in any manner that I can.' 27. Was Mr. Satterfield present on that occasion? A. He was. 28. So that you were to become a purchaser of $12,500.00 of the stock of the company, is that true? A. That is true. I eventually

had to pay $12,000.00 for that stock. 29. Did you pay par value for every dollar of stock which you received in the company? A. Yes, sir; and more than par value.''

Again he testified as follows:

''77. Do you know anything concerning a note of $6,000.00 signed by R. R. Satterfield, lodged with the First National Bank at Princeton, Kentucky? A. I knew there was such a note in existence; yes, sir. 78. Do you know under what conditions that note was made, of your own knowledge? A. No, sir; I think it was made for the purpose of advancing it to the Preston Hotel Company, for which Mr. Satterfield and Mr. White took an equal amount of stock. 79. Was that or was it not prior to the time that you became a stockholder in the hotel company? A. No, sir; I expect that was at the same time. I presume the amount of improvements were calculated at $15,000.00, and I think that $6,000.00 was secured at the time they made an effort to get the $10,000.00 from me to recover the entire improvements. 80. In other words, the entire improvements that was estimated then was to be $16,000.00? A. Fifteen or sixteen thousand dollars. 81. Of which $10,000.00 was to be paid by the money which you would pay for purchase of stock? A. Exactly. 82. And the other $6,000.00, was to be paid by Satterfield? A. For which he and Mr. White took an equal amount of stock. 83. Subsequently, the hotel company was unable to complete the improvements with the $16,000.00 thus obtained. Is that true? A. The improvements cost considerably more than they had calculated them. 84. Was it or was it not for the purpose of liquidating this further indebtedness of $10,000.00— A. It was. 85 (Continuing) That the loan was made at Princeton? A. It was.''

On cross-examination he testified as follows:

''88. Mr. McDevitt, when did you become a stockholder in the Preston Hotel Company? A. About the latter part of 1912 or 1913, when the stock was issued. 89. Was it or not in November, 1912? A. I would not be sure as to the date, Mr. Gates. 90. About that time? A. Well, that is my recollection, along in the fall or probably early part of the next year. 91. How many shares of the capital stock of the hotel company did you take? A. Twelve thousand, really. The agreement was to give me $12,500.00 worth of the stock if I would advance them $10,000.00. 92. And that stock was issued

to you in the fall of 1912? A. The stock book would show; I am not sure. 93. Who has the stock book? A. I can't answer that question; I don't know. The certificates are all with the bank at Princeton. 94. The $12,-500.00 of the capital stock was issued to you in consideration of the advancement by you to the hotel company of $10,000.00? A. Yes, sir. They were to pay me the $10,-000.00 back, which they did not do. 95. When did you make the advancement of $10,000.00? A. Well, along at that time, Mr. Gates, they called on me as they needed it and I gave it to them. 96. How did you give it to them? A. Either by check or cash. 97. Take any receipts for it? A. No, sir. 98. Have you any cancelled checks evidencing any of your payments? A. I don't presume I have.. I don't know. 99. Where did you then keep your bank account? A. I could not answer that question, because I had two, probably, or more. 100. Well, give as many of them as you can? A. Either in the National Bank of Commerce or the First National.''

Again he gave the following evidence:

''104. I will ask you if it is not a fact that you became interested in the hotel company under an arrangement with the then stockholders of the company, whereby you were to give the company your credit or advance it such funds as it might need to make the contemplated improvements, in consideration of the issue to you by the company of $12,000.00 of stock, and that such sums as you might advance were to be repaid to you by the company? A. I can't answer that question exactly. Ask me that again, if you please? (The last question was thereupon read to the witness by the stenographer). A. No, sir; the company—I agreed to loan them $10,000.00, for which they were to give me $12,500.00 worth of stock. I did give them $10,000.00; in fact, I paid in full for that $12,000.00 worth of stock. 105. At the time the $10,000.00 was borrowed from the First National Bank of Princeton, had you paid for that stock? A. I had. 106. And you don't now recall whether you paid it by check or in cash? A. I advanced money as the work was going on at all times. Mr. White would come to me and say we need a thousand or two thousand, whatever it might be, and I gave it to him. 107. Were the improvements actually in progress when you became a stockholder? A. No, sir; they were begun though pretty

shortly. They may have been in progress. I don't know. I don't remember. 108. I will ask you if it is not a fact that the $6,000.00 which R. R. Satterfield borrowed at Princeton on his own note was used to defray the expenses of the improvements before the $10,000.00 note—the proceeds of the $10,000.00 were used? A. I think they were. 109. How long a time elapsed between the date you became a stockholder and the excution of the original $10,000.00 note? A. I don't know the date of that $10,000.00 note. 110. It was less than a month, was it not? A. I don't know. 111. Now, I will ask you if you will examine your records, your cancelled checks, and file with the stenographer as part of your deposition any checks which you may have evidencing the payment for the $12,000.00 of stock which you say was issued to you in the hotel company in the fall of 1912? A. The better manner to get those would be the books of the Preston Hotel Company. 112. Are you the custodian of the books of the Preston Hotel Company? A. I am not. 113. I will again ask you if you will file with the stenographer as a part of your deposition the cancelled checks evidencing the payment of the $10,000.00 which you say you paid for your stock in the company? A. I don't know that I have them. 114. Will you examine and see if you have them? A. Well, I will examine them. I will look for them. The only record I would have would be the cancelled checks. I will look for them. 115. You say you will look for them? A. Yes, sir. 116. How long will it take you to determine whether or not you have those checks? A. I don't know. 117. Is it not a fact that the $10,000.00 for which the note was executed to the Bank of Princeton, was procured and advanced to the hotel company for you, and that the hotel company, under the arrangement between you and its then stockholders, was to repay that money to you, and that you were to have the $12,000.00 of stock as a bonus for the assistance you were giving the company for lending it your credit? A. It is not a fact. That agreement was not made in any reference to the $10,-000.00 note at Princeton, Kentucky. 118. You speak of having loaned the hotel company before you became a stockholder, $2,000.00. That was repaid you before you became a stockholder, was it not? A. Yes, sir. 119. As a matter of fact, can you now state that at the time you became a stockholder of the hotel company, that com-

pany owed you anything? A. They may have owed me something, I don't remember. They frequently borrowed from me, Mr. Gates. They may have owed me. 120. You stated in your direct examination that the money advanced by you to the hotel company was to be repaid to you? A. Yes, sir. 121. Why was it to be repaid you? A. Why was it? 122. Yes? A. They borrowed it from me. They agreed to give me the $12,000.00 worth of stock, and if they were successful, to pay me the $10,000.00. 123. Back? A. Yes, sir. They were not able to do that. I was required to pay in full, not only paid in full, but the Preston Hotel Company before it went into bankruptcy owed me something in the neighborhood of $25,000.00. At the last meeting that we held there of the creditors, I even made the proposition to loan $5,000.00 more if Mr. Satterfield would, to save the creditors and to save the property. He declined that proposition, and they went into bankruptcy. 124. Do you know where James R. White is? A. Yes, sir; I think he is in the city. He will be here today. 125. Do you know where J. R. White now resides? A. Detroit, Michigan.''

Re-direct examination by Mr. Washer:

"126. Mr. McDevitt, you have been asked about the returns of the $10,000.00 that you were supposed to have made; is it not a fact that those negotiations with the hotel company and Mr. White and Mr. Satterfield representing the hotel company, as to the loan of the $10,000.00, were entirely obliterated and altered when you purchased the stock of the company? A. They were. 127. So that is it or is it not true that the loan of $10,000.00 was never actually made to the company, but in lieu thereof, an outright purchase of $12,000.00 of the stock was made for which you paid par? A. That is true. I frequently had—afterwards, I frequently had to advance the payroll for the company. 128. So that, as a matter of fact, you never did lend the $10,000.00? A. I was required to buy that stock outright. 129. Did the negotiations which you had with the officers of the hotel company before you were a stockholder relative to this $10,000.00, which has been mentioned, have anything at all to do with the loan of $10,000.00 at Princeton, Kentucky? A. Nothing whatever. 130. Had that ever been discussed at that time? A. It had not. 131.

Did the hotel company know at that time that they would need an additional $10,000.00? A. It did not."

Re-cross examination by Mr. Gates:

"132. Did you not state a moment ago that before you became a stockholder, the improvements had been determined upon and that their costs had been approximated at $16,000.00? A. Fifteen or sixteen thousand dollars. 133. That was before you became a stockholder? A. Yes, sir. 134. Did you pay the $10,000.00 for your stock at the time it was issued to you? A. No, sir. 135. How long after it was issued to you did you pay for it? A. In a very short while. 136. By Mr. Washer: Approximate the time on that? A. Two or three months I was required to do it."

J. R. White testified that he was the president and manager of Preston Hotel Company. In the fall of 1912, it was agreed to increase the stock from $8,000.00 to $50,000.00, and to put certain improvements on the hotel, which were estimated to cost $15,000.00 or $16,000.00. Of this sum he and R. R. Satterfield were to raise $6,000.00 and he proposed to McDevitt that if he would raise $10,000.00 they would give him $12,500.00 worth of stock, and pay him his money back besides. This plan, however, was abandoned, and he and McDevitt afterwards endeavored to borrow $10,000.00 for the hotel company at some bank in Louisville, but were unable to do so. Then Mr. Satterfield took the loan up with the bank at Princeton. The bank required the deposit of the collateral pledged by McDevitt to protect McDevitt's endorsement. This note was made for the benefit of the hotel company, and not for the benefit of McDevitt. In making this loan he did not know of any other endorsers on the note except McDevitt, Satterfield and himself. Some time after the note was made the hotel company went into bankruptcy. The stock was issued to McDevitt, and though he did not pay for it at the time, he subsequently paid for it in different amounts at different times. On cross-examination he testified as follows:

"226. Did he ever loan the company the $10,000.00 referred to? A. Well, he never did propose to lend it himself. He proposed to get it through the bank for the company. 227. I think you are confused as to what $10,000.00 I am referring to. Of the $16,000.00 that was

to be raised for making the improvements, what portion of that was to be put up by McDevitt? A. $10,000.00."

Again he testified as follows:

"114. Mr. White, is it not a fact that Mr. McDevitt became a stockholder of the Preston Hotel Company under an arrangement with the then stockholders of the company whereby he was to lend the company his credit in procuring the money to make these improvements, and the company, in consideration of that fact, was to give him $12,000.00 of stock? A. They were to pay him the money back and give him $12,000.00 worth of stock. 115. Yes? A. Yes."

And again:

"118. When the stock was issued to Mr. McDevitt in the fall of 1912, did he pay the company $10,000.00 in cash? A. When it was issued to him? 119. Yes? A. No, sir."

He further testified as follows:

"125. Do you know how long a time elapsed between the date he got his stock in the company, and this $10,-000.00 was borrowed from the First National Bank at Princeton? A. Do I remember? Read that again. (The stenographer read the last question to the witness). A. This thing is sort getting clear to me now. I haven't had this thing in mind for so long. I think when we got this—when Satterfield for this money, that we issued stock, and we issued it to Mr. McDevitt. Now that is my recollection, and then Mr. McDevitt, I think, in some way found out that he was liable for all this thing and he would have to buy it in, and he really didn't have that much in, and he put the rest in. 126. Do you mean to say that McDevitt paid to the Preston Hotel Company $10,000.00 when the stock was issued to him? A. How is that? (Last question read to witness by stenographer). A. Oh! He never paid that; that $10,000.00 came from the Princeton bank. 127. That $10,000.00 then that was paid into the company at the time the stock was issued to Mr. McDevitt came from the Princeton bank? A. Yes. 128. And that was the only money that was paid for the stock issued to him at that time? A. I think so. 129. How long after that was it that he made these additional payments that you have referred to? A. He made them covering a period, as I said, from six months to two years, at different times. We were so harassed by our creditors that he loaned me money nearly when-

ever I went to see him. 130. But all these sums that were advanced by him to the hotel company, including the $10,000.00 borrowed at Princeton, were to be repaid, and he was to have the stock free, in consideration of lending the company his credit, if the company made good, isn't that true? A. Now wait, read that question. (The last question read to witness by the stenographer). A. He was to have the stock for the $10,000.00, and we was to pay the other $12,000.00 back to him; Mr. Washer can explain that better than I can. They claimed that he was liable for it, and in order to avoid getting into any entanglement, he paid for the stock. 131. The first $10,000.00 you mentioned, was the $10,000.00 you got at Princeton, was it not? A. Yes, sir.''

From the foregoing statement of the evidence it will be seen that R. R. Satterfield, J. R. White and McDevitt all agree that the hotel property was to be improved, and that the estimated cost of these improvements was about $16,000.00. They further agree on the fact that the capital stock of the company was to be increased from $8,000.00 to $50,000.00. They also agree that additional stock was to be issued to R. R. Satterfield and White, who were to furnish $6,000.00 of the $16,000.00 required for the improvements. Furthermore, there is no conflict in their evidence with respect to the original proposition made by White to McDevitt. Under that arrangement, McDevitt was to take $12,000.00 worth of stock in the company and lend the company $10,000.00, which the company was to repay. The only disagreement between the witnesses is that R. R. Satterfield claims that this arrangement was carried out, while McDevitt and White say that it was abandoned and that the note for $10,000.00 was not executed pursuant to the original agreement. Notwithstanding the latter contention, the following facts are fully established: R. R. Satterfield complied with his part of the agreement and raised the $6,000.00 which he and White were to furnish, and they received the additional stock therefor. The proceeds of this loan were used to pay for the improvements until it became necessary to obtain the remainder of the required sum. Stock to the amount of $12,000.00 was actually issued to McDevitt. McDevitt and White endeavored to secure the loan of $10,000.00 in the city of Louisville. Failing in this, McDevitt authorized R. R. Satterfield to obtain the loan at Prince-

ton, and to pledge as collateral security certain stock which McDevitt owned. The stock which was issued to McDevitt was not paid for when issued. While White and McDevitt claim that this stock was subsequently paid for by McDevitt, McDevitt, who was asked to file any receipts or cancelled checks, showing such payment, failed to do so. White admits that the $10,000.00 that was paid to the company at the time the stock was issued to McDevitt came from the Princeton bank, and that that was the only money that was paid for the stock at the time it was issued. While the claims that McDevitt thereafter made certain payments covering a period of from six months to two years, he clearly shows that these were mere loans made to the company because it was harassed by its creditors, and does not show that they were actual payments on the stock theretofore issued. If the $10,000.00 obtained from the Princeton bank on the note in question was not the $10,-000.00 which McDevitt agreed to furnish in consideration of the stock that was issued to him, we are unable to perceive why he pledged his individual stock in other companies to secure the loan, or why the hotel company's stock was actually issued to him without being paid for at the time. Though McDevitt and White claim that the original agreement was abandoned, the facts which they admit show that this agreement was actually carried out, and that the note in question was executed to the Princeton bank for the purpose of obtaining the $10,000.00 which McDevitt had agreed to furnish in consideration of the stock which the company issued to him, and of the further agreement on the part of the company to repay the money furnished. The argument that it is absurd to say that McDevitt borrowed the money from the bank for the purpose of lending it to the hotel company loses all of its force when we remember that, under the agreement, he was not only to receive $12,-000.00 worth of stock, but the company itself was to repay the $10,000.00 so furnished.

The evidence leaves no doubt that R. R. Satterfield was authorized by McDevitt to procure the loan and to pledge McDevitt's stock in other companies as collateral security. The note signed by the Preston Hotel Company, McDevitt, White and R. R. Satterfield was forwarded to the bank with the collateral attached. The bank demanded other security. R. R. Satterfield pro-

cured the signatures of his brothers and sister, who were not interested in the hotel property, by assuring them that he, White and McDevitt would stand between them and loss, and that the note was fully secured by the collateral deposited by McDevitt. Since the money was borrowed to enable McDevitt to pay the $10,000.00 which he had agreed to furnish, and since F. P. Satterfield, H. K. Satterfield, C. N. Satterfield, Hugh Satterfield and Mary Bird Satterfield signed the note for the sole purpose of enabling McDevitt to get the money, we conclude that, with respect to them, McDevitt was a principal, and liable for the full amount of the note. It follows that the chancellor did not err in so holding.

Judgment affirmed.